UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DENISE N.[1],                          :
                                       :
            Plaintiff,                 :
                                       :
v.                                     :    CASE NO.: 4:19-CV-121
                                       :
ANDREW SAUL,                           :
Commissioner of Social Security,       :
                                       :
            Defendant.                 :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Denise N. ("Plaintiff" or "Denise") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401-34. Denise's pro se pleadings raise multiple assignments of error in the decision by the Administrative Law Judge ("ALJ") that heard her claim. Broadly, she claims that the ALJ improperly failed to consider relevant evidence and to apply the appropriate presumptions in her case. Pl.'s Br. (ECF No. 16). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b)

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

On June 2, 2016, Denise filed an application for disability insurance benefits ("DIB"), alleging disability beginning January 1, 2009, due to Human Immunodeficiency Virus ("HIV"), obesity, osteoarthritis, patellofemoral knee syndrome, sarcoidosis, anxiety, depression, sleep apnea, and asthma. (R. 75, 135-41).[2] The Commissioner initially denied her application on October 5, 2016 (R. 74-80), and upon reconsideration on March 24, 2017. (R. 81-88). Denise then requested an administrative hearing, which was conducted on August 16, 2018. (R. 41-73).

On October 19, 2018, an ALJ concluded that Denise was not disabled within the meaning of the Social Security Act, and denied her claim for disability benefits. (R. 25-40). The Appeals Council denied review of the ALJ's decision on September 26, 2019 (R. 1-6), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g),

---

[2] Denise had previously applied for supplemental security income ("SSI") and DIB in 2014 and attached documents relevant to these prior claims to her Motion for Summary Judgment. Pl.'s Br. Ex. 3-5, 8 (ECF No. 16-3, 16-4, 16-5, 16-8). As later applications are considered separate claims, these documents are not relevant to Denise's current appeal of her June 2, 2016 application. See Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 476 (4th Cir. 1999) ("The SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability… The SSA's treatment of later-filed applications as separate claims is eminently logical and sensible.")

Denise filed this action, on December 2, 2019, seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.  **FACTUAL BACKGROUND**

At the time of her date last insured in 2009, Denise was thirty-six years old, a younger individual under Agency rules. 20 C.F.R. § 404.1563. She had a high school education and past relevant work experience as a janitor. (R. 50, 68).

Although Denise filed her claim in June 2016, she alleged disability beginning January 2009, and her date last insured was March 31, 2009. Thus, to receive DIB Denise had to establish that she experienced disability between these two dates. See 42 U.S.C. § 423(a), (c); 20 C.F.R. §§ 404.101(a), 404.131(a). Despite few medical records related to the relevant time period, the ALJ's detailed review of the medical evidence spans years on both sides of Denise's claimed period of disability.

### A. Denise's Medical and Treatment History

Medical evidence in the record begins with Denise's treatment by Daniel Kluger, M.D. on March 29, 2004. (R. 908-09). Denise was referred to Dr. Kluger for evaluation of her HIV, which she had been diagnosed with in 1994. Pl.'s Compl.

(ECF No. 5, at 1); (R. 908).[3] At that time, she was off highly active antiretroviral therapy, but had taken Dideoxycytidine ("DDC") for a short period and was given prescriptions for combination therapy, which she did not fill. (R. 908). Overall, Denise reported feeling well and denied any symptoms of abdominal pain, nausea, vomiting, diarrhea, dysuria, or new skin rashes. (R. 908). Dr. Kluger placed Denise on antiretroviral therapy and followed-up with her two months later, at which point Denise reported she was "100% adherent" to her medications. (R. 909-10). Her HIV was "undetectable" with a viral load[4] of less than 50 and a CD4[5] count of 430. (R. 910). Denise again reported that she was "doing well" and did not complain of any fever, chills, sweats, nausea, vomiting, or

---

[3] Dr. Kluger's initial treatment report states that Denise was diagnosed with HIV during her pregnancy in 1995. (R. 908). However, Denise states that she received her diagnosis in 1994. Pl.'s Compl. (ECF No. 5, at 1).

[4] "CD4 cells ... are white blood cells that fight infection. CD4 cell count is an indicator of immune function in patients living with HIV." *CD4 Count (or T-Cell Count)*, U.S. DEP'T OF VETERAN AFFS., https://www.hiv.va.gov/patient/diagnosis/labs-cD4-count.asp (last visited October 19, 2020). An average range for CD4 cells is approximately 500-1,600 cells/mm³. *What to Expect at Your First HIV Care Visit*, HIV.GOV, https://www.hiv.va.gov/hiv-basics/starting-hiv-care/getting-ready-for-your-first-visit/what-to-expect-at-your-first-hiv-care-visit (last visited October 19, 2020). Individuals are generally diagnosed with Acquired Immunodeficiency Syndrome ("AIDS") when their CD4 count drops below 200. *About HIV*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/hiv/basics/whatishiv.html (last visited October 19, 2020).

[5] "HIV viral load tests measure the amount of HIV in the blood. Lower levels are better than higher levels. The main goal of HIV drugs is to reduce the HIV viral load to an 'undetectable' level, meaning that the HIV RNA is below the level that the test is able to count." *HIV Viral Load (or 'HIV RNA')*, U.S. DEP'T OF VETERAN AFFS., https://www.hiv.va.gov/patient/diagnosis/labs-viral-load.asp (last visited October 19, 2020).

4

diarrhea. (R. 910).

Dr. Kluger next saw Denise on February 28, 2005 for a follow-up HIV evaluation. (R. 912). Denise complained of "profound fatigue," which Dr. Kluger attributed to anemia. (R. 912). Denise's viral load was less than 50, her CD4 count was 570, and she "had virologic control with highly active antiretroviral therapy." (R. 912). Dr. Kluger issued her a prescription for thrush and noted that Denise's next follow-up should occur in three months. (R. 912). However, Dr. Kluger next saw Denise eight months later on October 5, 2005. (R. 913). During this visit, Denise reported "profound fatigue with weight gain" and incomplete adherence to antiretroviral therapy. (R. 913). Dr. Kluger had a long discussion with Denise about the need for "100% adherence" to medications, and ordered virologic testing and a hold on antiretrovirals. (R. 913).

Denise, who remained off antiretroviral therapy, returned to Dr. Kruger on March 22, 2006. (R. 914). She reported "feeling better" and denied fever, chills, sweats, nausea, vomiting, or diarrhea. (R. 914). Denise's viral load was 32,000 and her CD4 count was 480. (R. 914). Dr. Kluger recommended continuing to hold antiretroviral therapy as Denise's CD4 count was above the 300-350 range. (R. 914). Dr. Kluger next saw Denise in December 2006. (R. 915). Denise denied any additional complaints, but her CD4 count was 400 and

she wanted to restart antiretroviral therapy.  (R. 915).  Dr. Kluger placed Denise on a new combination of medications.  (R. 915).  He also instructed her to obtain regular follow-up appointments.  (R. 915).

On January 29, 2007, Denise had another appointment with Dr. Kluger who noted that she was "adherent and tolerant to antiretroviral therapy" and ordered virologic testing.  (R. 916).  Dr. Kluger told Denise to follow-up in three months' time.  (R. 916).  But Denise did not see Dr. Kluger again until June 2007, at which point she denied fever, chills, sweats, nausea, or vomiting and reported adherence to her antiretroviral therapy.  (R. 917).  Her viral load quantity was "not sufficient" to note and her CD4 count was 460.  (R. 917).  On October 15, 2007, Denise returned to Dr. Kluger and stated that she had been nonadherent to her antiretroviral therapy for the past six weeks.  (R. 927).  She reported "feel[ing] well" aside from recurrent bacterial vaginosis.  (R. 927).  Her viral load was undetectable as of September 27, 2007 and her CD4 count was 770.  (R. 927).  Therefore, Dr. Kluger deferred further antiretroviral therapy.  (R. 927).

In January 2008, Denise again followed-up with Dr. Kluger. (R. 928).  Denise reported "doing well" and denied any symptoms including fever, chills, sweats, nausea, vomiting, or diarrhea. (R. 928).  She also continued to have an undetectable viral load

6

and a CD4 count of 775.  (R. 928).  As Denise's HIV was under "[i]nnate virologic control," Dr. Kluger again deferred antiretroviral therapy.  (R. 928).  He ordered repeat virologic testing and told Denise to follow up in four months.  (R. 928). On August 27, 2008, Denise reported "feel[ing] well" although she had some modest facial congestion.  (R. 929).  Her viral load was 12,000 and her CD4 count was 328.  (R. 929).  Dr. Kluger noted that Denise's HIV was advancing and that they would likely need to begin antiretroviral therapy again.  (R. 929). He sent Denise for further lab testing and told her to follow-up in six months.  (R. 929).

In April 2009, Denise returned to Dr. Kluger with continuing complaints of right lymph node swelling and weight gain, but denied fever, chills, sweats, nausea, vomiting, and diarrhea.  (R. 930).  Dr. Kluger noted that Denise remained clinically stable off antiretroviral therapy and ordered  repeat virologic testing.  (R. 930).

Denise continued to do well in January 2010.  (R. 931). Her right lymph node swelling had resolved, and she did not report any fevers, chills, sweats, nausea, vomiting, or diarrhea.  (R. 931).  Denise's CD4 count was 424.  (R. 931). But because Denise was anxious to initiate antiretroviral therapy, Dr. Kluger again prescribed medications and cautioned Denise about the need for complete adherence.  (R. 931).  On

7

June 21, 2010, Denise stated she was "doing well" and tolerating her antiretroviral therapy. (R. 932). Her viral load at this time was less than 48 and her CD4 count was 688. (R. 932). Dr. Kluger assessed "[c]ontrolled viral replication" and refilled Denise's medications. (R. 932). He also noted that her recurrent bacterial vaginosis was responding to medication and that he "doubt[ed] this [was] directly related to her disease and any component of immunosuppression." (R. 932). In September 2011, May 2012, and November 2012, Denise continued to report adherence, with occasional missed doses, and tolerance to her antiretroviral therapy. (R. 933-35).

As related in the Administrative Record, from 2012 through 2016, Denise was treated for various other medical conditions. In August 2012 Denise was diagnosed with sleep apnea and began using a CPAP. (R. 570-71, 577-78, 674-76, 679-82). During this time, she was also treated for sinusitis, allergies, and asthma, which were managed using medications. (R. 269-71, 386, 419, 424, 434, 538-39, 575-78, 580-81, 651, 655, 659-64, 670-71, 713-14). Additionally, Denise sought treatment for knee pain in 2015 (R. 591-607), as well as treatment for depression and anxiety. (R. 380-81, 392-93, 429-30). Denise also reported shortness of breath after her breast reduction surgery, which medical tests revealed to be suspected sarcoidosis. (R. 244-55, 398-403, 478-80, 489-90).

8

In connection with her application for benefits, Denise's records were reviewed by two agency physicians, Bert Spetzler, M.D. and Wyatt Beazly, III, M.D. in October 2016 and March 2017 respectively.     (R. 79, 87).     Dr. Spetzler noted that the evidence in the record was "not sufficient to fully evaluate [Denise's] claim," but that the evidence needed could not be obtained.   (R. 79).   Based on the available medical records and Denise's statements, he determined that she failed to demonstrate any severe physical impairment before her date of last insured of March 31, 2009.   (R. 79).   On reconsideration, Dr. Beazly reached the same conclusion.   (R. 87).

Additionally, in a letter dated August 29, 2017, Denise's primary care provider since 2012, Pl.'s Br. Ex. 6 (ECF No. 16-6), Jana Nussen, M.D., offered her opinion that Denise had "multiple medical problems that have made it difficult to maintain gainful employment over the years."   (R. 907).   She described the history of Denise's HIV diagnosis beginning in 1994 stating, "[a]fter some lapse in care and failed treatments, her CD4 counts were low in 2004 and she suffered from multiple infections at that time.   Since that time, her counts have improved on her current treatment."   (R. 907).   Dr. Nussen also noted Denise's current treatment for sinusitis, headaches, sarcoidosis, asthma, pulmonary nodules, knee pain, vaginosis, depression, and anxiety, including panic attacks while driving.

(R. 907).

**B. The ALJ Hearing**

At the ALJ hearing, Denise produced additional medical records dating back to 2004, which the Agency had not previously received. (R. 54-55, 72). Denise testified that she began seeing Dr. Kluger in 2004 to address her HIV and that during her treatment with Dr. Kluger she had needed to change medications when she stopped responding to treatment. (R. 55-56). Denise asserted that her HIV was advancing in 2009 and that she experienced "a lot" of symptoms including bacterial vaginosis; pulmonary issues, such as sinusitis and pulmonary nodules; and swollen lymph nodes. (R. 56-57). She also stated that she had osteoarthritis in her knees, which made it difficult for her to stand for periods of time longer than at least one hour but that she could sit for longer and could walk for thirty minutes. (R. 57-58). She was also able to lift some items, such as a gallon of milk. (R. 58-59). According to Denise, her osteoarthritis made it painful for her to climb the stairs of her townhouse, but she occasionally cooked for her children and did laundry. (R. 48-49, 59, 61). She testified that in 2009 her asthma was under control with the use of inhalers and a nebulizer and that she was not yet being treated for sarcoidosis, anxiety, or depression. (R. 59-60). Additionally, she did not have any restrictions on her ability to drive in 2009. (R. 62). Denise

10

stated that her symptoms have continued to worsen since 2009. (R. 67).

In addition to her medical conditions, Denise testified that due to her illness she had been unable to retain a job, pointing to her 2001 employment with Pizza Hut, from which she was asked to resign due to missed work. (R. 63). Denise also testified that when working for West Teleservices in 2009 she would miss approximately one week of work per month because of her medical conditions. (R. 63-65).

During the hearing, the ALJ also considered the testimony of a Vocational Expert ("VE"). The VE first testified that the only full-time work was Denise's past work as a janitor and that this work was unskilled work with a medium exertion level. (R. 68). The VE also testified that Denise was unable to perform her past relevant work, as it exceeded her residual functional capacity ("RFC"), as described in the ALJ's hypothetical. (R. 68). The ALJ posed a hypothetical involving a person of Denise's age, education, and work experience, who was capable of light work that did not involve climbing ladders, ropes, and scaffolds, crawling, or kneeling, but that did involve occasionally performing other postural movements; who had to avoid fast-paced tasks such as assembly-line jobs with production quotas; was limited to only occasional or brief and superficial contact with the public and coworkers; had to avoid

11

exposure to workplace hazards, including dangerous moving machinery and unprotected heights; and to avoid concentrated exposure to respiratory irritants, temperature extremes, or humidity. (R. 68). In response to which the VE stated that such a person would be able to perform unskilled, light and sedentary jobs, such as a clerical checker, inspector, sorter, and addressing clerk. (R. 68-69). The VE also testified that her descriptions of employment were consistent with the Dictionary of Occupational Titles ("DOT"), although the description of interaction with people was more specific than that given by the DOT. (R. 69). However, the VE noted that all the jobs she had proposed involved limited contact with people. (R. 69). The VE also testified that a person who could not sit or stand for longer than an hour or walk more than thirty minutes could still perform these jobs. (R. 69-70). This opinion was based on the VE's professional judgment, as these limitations were also not specifically referenced in the DOT. (R. 70).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d

650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i), 423, an individual must meet the insured status requirements of these sections, be under the age of sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

14

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.   An affirmative answer to question three or five establishes disability.   This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.   The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step.   Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and

present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## A.   The ALJ's Decision

After first finding that Denise last met the insured status requirements of the Social Security Act through March 31, 2009, the ALJ made the following findings under the five part analysis: (1) Denise did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2009 through her last insured date of March 31, 2009; (2) Denise had severe impairments of HIV, obesity, lymphadenopathy, and anemia; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; and (4) Denise had the RFC to perform light work that avoided climbing ladders, ropes, and scaffolds, crawling, or kneeling, but did involve occasionally performing other postural movements; that avoided fast-paced tasks such as assembly-line jobs with production quotas; that was limited to only occasional or brief and superficial contact with the public and coworkers; that avoided exposure to workplace hazards, including dangerous moving machinery and unprotected heights; and that avoided concentrated exposure to respiratory irritants, temperature

16

extremes, or humidity. (R. 30-33, 68). Finally, at step five, although the ALJ concluded that Denise could not perform her past relevant work, he did identify jobs which exist in significant numbers in the national economy which Denise could perform. (R. 35-36).

Denise now argues that the ALJ erred in finding her not disabled. Specifically, she claims that the Commissioner did not: (1) note a remote job in her earnings record; (2) timely receive and consider her medical records for the relevant period of January 1, 2009 through March 31, 2009; (3) apply the Program Operations Manual System ("POMS") DI 11055.241 to her case; (4) consider certain evidence; and (5) find Denise met Listing 14.11 for HIV. Pl.'s Br. (ECF No. 16). The Court considers each argument below.

**B.   The ALJ took the necessary steps to complete the record at the hearing.**

Denise argues that the Commissioner was negligent in not having received her HIV treatment records from Dr. Kluger from around the relevant period of January 1, 2009 through March 31, 2009. Pl.'s Br. (ECF No. 16, at 1). The government reads Denise's complaint to only allege fault for not having received the documents earlier rather than to allege that the ALJ did not consider the records. Def.'s Br. (ECF No. 18, at 10-11). However, Denise's complaint can also be read to allege that the

17

Commissioner's decision was made without considering this evidence, as she notes that the ALJ upheld the denial of her claim and the transcript "only reflects the ALJ stating he [would] scan the records into the file." Pl.'s Br. (ECF No. 16, at 1). However, neither understanding of Denise's argument is persuasive.

In September 2016, the agency requested from the Infectious Disease Associates of Hampton Roads, where Dr. Kluger was employed, all patient records for Denise dating from January 1, 2008. (R. 732-34). The agency received some records in response, (R. 735-808), but as noted at the administrative hearing, did not receive records covering Denise's treatment prior to 2010. (R. 54-55). However, during the hearing, Denise supplied additional records dating back to 2004, which the ALJ included in the record. (R. 54-55). Thus, the record was completed before the ALJ reached his decision and the ALJ's post-hearing written decision demonstrates that he thoroughly considered Denise's additional medical records regarding her HIV treatment with Dr. Kluger in resolving her DIB claim. (R. 34) (describing Denise's treatment records from 2004, 2008, and 2009). Although the agency did not have these records when previously evaluating Denise's claim, the issue on appeal is the "final decision of the Commissioner of Social Security." 42 U.S.C. § 405(g). In other words, the decision of the ALJ, which

was made in reliance on a completed record.

While Denise expresses frustration that she had "to do the work to provide the information" and that such information was not received sooner, Pl.'s Br. (ECF No. 16, at 2), claimants generally bear the burden of producing evidence to establish their disability. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled."). The agency is only required to make a "reasonable effort" to obtain medical evidence by requesting it from the source, which the agency did. 20 C.F.R. § 404.1512(b); (R. 732-34).

Denise also alleges that the ALJ did not consider her Pizza Hut job from 2001 through 2002. Pl.'s Br. (ECF No. 16, at 1). During the administrative hearing, the ALJ commented that he did not see Pizza Hut listed on Denise's earning report. Id.; (R. 63). However, this employment is listed as "Colonial Foods, LLC," an affiliate of Pizza Hut, on the report. (R. 154). Therefore, these earnings were included in Denise's certified earnings when calculating her insured status. (R. 143-59). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different." Shineski v. Sanders, 556 U.S. 396, 411 (2009). Here, there is no indication that the

19

ALJ's statement had any impact on Denise's claim and thus it cannot serve as the basis for remand. See id. at 409 (citations omitted) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Additionally, Denise's comments regarding her employment with Pizza Hut arose when the ALJ asked her if there was anything she wanted to tell him about how her medical condition, "affected [her] ability to work in *2009*?" (R. 63) (emphasis added). In response to which Denise began discussing her employment with Pizza Hut in 2001, which the ALJ noted "was eight years before [she] allegedly became disabled in 2009" and thus not relevant to determining Denise's ability to work during the timeframe in question. (R. 63). In sum, the Commissioner did not act negligently by failing to consider Denise's prior employment at Pizza Hut, which was included when calculating her insured status and was not relevant with respect to ALJ's line of questioning regarding to Denise's ability to work in 2009.

C. **Program Operations Manual System ("POMS") DI 11055.241 did not apply in Denise's case.**

Denise also asserts that the Program Operations Manual System ("POMS") DI 11055.241 should have been applied in her case and that the related form SSA-4814-F5 was never completed. Pl.'s Br. (ECF No. 16, at 2). POMS DI 11055.241 is entitled

20

"Field Office (FO) Responsibilities in Presumptive Disability (PD) Claims with an Allegation of Human Immunodeficiency Virus (HIV) Infection or Acquired Immunodeficiency Syndrome (AIDS)." (R. 203). This section of the POMS provides instructions for determining presumptive disability claims with an allegation of HIV infection or AIDS. (R 203). Under this section, a Field Office can make a presumptive disability determination for a claimant who alleges HIV or whose medical sources provide confirmation of HIV, and, in the case of adults, whose HIV status is confirmed by form SSA-4814-F5, which is entitled "Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV)." (R. 203).

Judicial review under 42 U.S.C. § 405(g) does not address the determinations of Field Offices, but is limited to reviewing the "final decision of the Commissioner of Social Security." 42 U.S.C. § 405(g). Further, even if reviewable, the presumptive disability provisions laid out in the POMS "only apply to Supplemental Security Income (SSI)" as "[t]he purpose of the PD[] provision is to expedite monthly benefits to claimants that … are [presumed] disabled … and are otherwise eligible while the more extensive development is completed." POMS DI 11055.230. Thus, the Field Office reports from June 22, 2016, December 1, 2016, and May 8, 2017, did not consider whether Denise met the criteria for a presumptive disability, because Denise had not

21

made a SSI claim in her June 2, 2016 application that is currently on appeal. (R. 171, 184, 227). Accordingly, the Commissioner did not err by not applying the POMS DI 11055.241 to Denise's case.

**D. The ALJ properly evaluated the evidence bearing on Denise's RFC.**

Denise disagrees with the ALJ's consideration of the evidence, which she believes supports a conclusion that she is disabled. Specifically, she objects to the ALJ only considering three years of the record and the ALJ's decision to give little weight to the opinion of Denise's primary care physician Dr. Jana Nussen. Pl.'s Br. (ECF No. 16, at 2). Because the ALJ properly considered the records relevant to Denise's claim for DIB and explained why he gave Dr. Nussen's opinion little weight, I conclude remand is unwarranted on these grounds.

Denise asserts that she was disabled as of January 1, 2009 and her date of last insured is March 31, 2009. To receive DIB, Denise needed to establish that she was disabled within this relevant period. See 42 U.S.C. § 423(a), (c); 20 C.F.R. §§ 404.101(a), 404.131(a). However, the medical records available in the Administrative Record do not address this narrow time frame specifically. Thus, the ALJ appropriately considered medical records from around this time period, including Denise's treatment records from January 30, 2008 and April 28, 2009, as

22

well as looking back at Denise's 2004 HIV treatment records.
(R. 34). According to the 2008 medical records, Denise was
"doing well" and did not report any HIV symptoms, such as fever,
chills, sweats, nausea, vomiting, or diarrhea. (R. 928). In
fact, in January 2008, Denise's HIV was under "[i]nnate
virologic control." (R. 928). And one month after Denise's
date last insured, Dr. Kluger noted that she was "clinically
stable off antiretroviral therapy." (R. 930). Notably,
Denise's only noted medical complaints to Dr. Kruger in 2008 and
2009 were facial congestion, lymph node swelling, and weight
gain. (R. 929-30). Thus, the ALJ had substantial evidence to
find that Denise's "symptoms from her medically determinable and
severe impairments were stable from her alleged onset date of
January 1, 2009 through her date last insured of March 31, 2009
based on the medical records in proximity to the relevant
period." (R. 34).

     With regard to Dr. Nussen's opinion, ordinarily the ALJ
will give a treating physician's opinion "controlling weight" if
the opinion "is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent
with the other substantial evidence in [the] case record." 20
C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Lewis v.

Berryhill, 858 F. 3d 858, 867 (4th Cir. 2017).[6] But the ALJ has "discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). The ALJ also need not accept the opinion from a treating source if the source opines on whether a claimant is disabled, as the determination of disability is an "administrative finding[]" reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

If a treating physician's medical opinion is not given controlling weight, then the ALJ will look at a variety of factors to evaluate the opinion including (1) the length of the treatment relationship, (2) the nature and extent of the relationship, (3) whether there is relevant evidence to support

---

[6] "Effective March 27, 2017, the SSA rescinded § 404.1527 and § 416.927 and implemented a new rule governing the consideration of medical opinions." Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D.W. Va. May 2, 2019) (citing 20 C.F.R. § 404.1520c (2017)). "Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency." Id. (citing 20 C.F.R. §§ 404.1520c(a), (c)(1)-(2)). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Denise filed her claim. Id.

a medical opinion, (4) the consistency of the medical opinion with the record as a whole, and (5) the physician's specialization.   20 C.F.R. §§ 404.1527(c), 416.927(c); see also Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). Additionally, when the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ is required to provide an explanation for the weight given to the opinion.   20 C.F.R. § 404.1527(c)(2).   But courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion "absent some indication that the ALJ … dredged up 'specious inconsistences,' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992) (citing 20 C.F.R. § 404.1527(d)).

Dr. Nussen's 2017 opinion stated that Denise had "multiple medical problems that have made it difficult to maintain gainful employment over the years," and explained that Denise's conditions dated back to her 1994 HIV diagnosis.   (R. 907). According to Dr. Nussen, "[a]fter some lapse in care and failed treatments, her CD4 counts were low in 2004 and she suffered from multiple infections at that time," but since then "her counts have improved on her current treatment."   (R. 907).   The letter also described Denise's treatment for her conditions as

of 2017, including her knee pain, which made it difficult for Denise to stand or even sit for prolonged periods of time. (R. 907).

However, the ALJ explained that he gave Dr. Nussen's opinion "little weight, as it [did] not contain specific work-related limitations during the relevant period of adjudication." (R. 35). The ALJ's determination that Dr. Nussen's opinion was not entitled to significant weight was appropriate based on the medical record. With regard to Denise's HIV, Dr. Nussen only stated that Denise's CD4 counts were low in 2004, but acknowledged that they improved with treatment. (R. 907). In fact, Denise's only treatment record from 2009 states that she was "clinically stable" while off antiretroviral therapy. (R. 930). Thus, Dr. Nussen's opinion did not provide any relevant information about Denise's HIV for the period from January 1, 2009 to March 31, 2009. Additionally, the other conditions addressed by Dr. Nussen in her letter were not severe during the relevant period in 2009. For example, Denise did not seek treatment for reported problems with her knee until 2015. (R. 31, 34-35, 591-607).[7]   The ALJ was also not required to give

---

[7] Dr. Nussen also mentions that Denise has experienced sinusitis and parotid mass, headaches, sarcoidosis, asthma and pulmonary nodules, chronic vaginitis, depression, anxiety, and panic attacks while driving. However, the ALJ considered Denise's alleged impairments in addition to HIV and determined that they were non-severe in 2009, as "they did not require any significant medical treatment and did not result in any basic work-related

weight to Dr. Nussen's conclusory statement that "multiple medical problems … have made it difficult [for Denise] to maintain gainful employment over the years," (R. 907), as such a determination of disability is reserved for the Commissioner. 20 C.F.R. § 404.1527(d) (stating that opinions regarding whether a claimant is disabled are not entitled to any special significance, as the determination of disability is an "administrative finding[]" reserved to the Commissioner).

In her Motion for Summary Judgment, Denise now includes three additional opinions from Dr. Nussen from 2015, 2016, and 2019. To justify remanding the case to the ALJ for consideration of these additional opinions, the Plaintiff must establish that: (1) the evidence is new, i.e., "not duplicative or cumulative;" (2) the evidence is material, meaning that "there is a reasonable possibility that the new evidence would have changed the outcome;" (3) the evidence "relates to the period on or before the date of the ALJ's decision;" and (4) there is good cause for failing to present the evidence earlier. Wilkins v. Sec'y, Health & Human Servs., 953 F.2d 93, 95-96, 96 n.3 (4th Cir. 1991); see also 42 U.S.C. § 405(g); Stanton v. Colvin, 2015 WL 627876, at *11-12 (E.D. Va. 2015). Here, Dr. Nussen's additional opinions are neither new nor material, nor

---

limitations" at the time. (ECF No. 30-31). Dr. Nussen's opinion, rendered in 2017, does not specify otherwise.

do they relate to the relevant time period.

First, these opinions are not new, as they provide only duplicative and cumulative evidence. Similar to Dr. Nussen's 2017 opinion, these opinions provide only conclusory statements that Denise is unable to work. Pl.'s Br. Ex. 6 (ECF No. 16-6, at 2) (stating that Denise "suffers from multiple health conditions that have affected her quality of life and ability to work,"); Pl.'s Br. Ex. 7 (ECF No. 16-7, at 2) (stating Denise "is currently being managed for multiple chronic conditions that have made it difficult for her to maintain gainful employment."); Pl.'s Br. Ex. 7 (ECF No. 16-7, at 3) ("Due to [Denise's] multiple medical conditions she is unable to maintain gainful employment."). Moreover, the 2015 and 2016 opinions discuss medical conditions that were addressed in Dr. Nussen's 2017 opinion and elsewhere in the record. Pl.'s Br. Ex. 6 (ECF No. 16-6, at 2) (mentioning hypertension, gastroesophageal reflux disease, obesity, depression, sinus conditions, allergic rhinitis, knee pain, sleep apnea, asthma, HIV, and uterine and vaginal conditions); Pl.'s Br. Ex. 7 (ECF No. 16-7, at 2) (reporting HIV, chronic sinusitis, headaches, knee discomfort, asthma, pulmonary nodules, vaginitis, depression, anxiety, and panic attacks while driving).

Further, like the 2017 letter considered by the ALJ, these opinions also do not provide evidence of Denise's work-related

limitations during the relevant period in 2009. Therefore, the ALJ's reasoning regarding the weight which he gave the 2017 letter is equally applicable to these opinions. As there is no reasonable possibility that the ALJ's decision would change on remand based on opinions that do not significantly depart from Dr. Nussen's prior opinion already considered by the ALJ, this additional evidence is not material evidence that warrants remanding the case for reconsideration.

**E.   The ALJ had substantial evidence to find that Denise did not meet the criteria to establish _per se_ disability under Listing 14.11 for HIV.**

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). These listings are found in 20 C.F.R. Part 404, Subpart. P, App. 1, which defines impairments, "in terms of several specific medical signs, symptoms, or laboratory test results" that are severe enough to prevent a claimant from being unable to engage in any gainful activity. Sullivan v. Zebley, 493 U.S. 521, 530, 532 (1990) (citing 20 C.F.R. § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity");

29

SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)[8] (listings define "medical conditions which ordinarily prevent an individual from engaging in any gainful activity")). A claimant is entitled to this conclusive presumption of impairment "if he can show that his condition 'meets or equals the listed impairments.'" Radford, 734 F.3d at 291 (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)); see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."). To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530 (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)).

Denise asserts that the ALJ should have found that Denise met the criteria for a per se disability due to her HIV under Listing 14.11. Pl.'s Br. (ECF. No. 16, at 2). Listing 14.11, which addresses HIV, requires:

> [D]ocumentation as described in 14.00F1 and one of the following:
>
>     A.   Multicentric   (not   localized   or   unicentric)

---

[8] SSR 83-19 has been rescinded in part with respect to the procedures used to determine disability in children, but otherwise remains an accurate representation of the Social Security Administration's policies and regulations. See SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

Castleman disease affecting multiple groups of lymph nodes or organs containing lymphoid tissue (see 14.00F3a);

B. Primary central nervous system lymphoma (see 14.00F3b);

C. Primary effusion lymphoma (see 14.00F3c);

D. Progressive multifocal leukoencephalopathy (see 14.00F3d);

E. Pulmonary Kaposi sarcoma (see 14.00F3e);

F. Absolute CD4 count of 50 cells/mm$^3$ or less (see 14.00F4);

G. Absolute CD4 count of less than 200 cells/mm$^3$ or CD4 percentage of less than 14 percent, and one of the following (values do not have to be measured on the same date) (see 14.00F5):

   1. BMI measurement of less than 18.5; or

   2. Hemoglobin measurement of less than 8.0 grams per deciliter (g/dL);

H. Complication(s) of HIV infection requiring at least three hospitalizations within a 12-month period and at least 30 days apart (see 14.00F6). Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization; or

I. Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.11A-H, but without the requisite findings for those listings (for example, Kaposi sarcoma not meeting the criteria in 14.11E), or other manifestations (including, but not limited to, cardiovascular disease (including myocarditis, pericardial effusion, pericarditis, endocarditis, or pulmonary arteritis), diarrhea, distal sensory polyneuropathy, glucose intolerance, gynecologic conditions (including cervical cancer or pelvic inflammatory disease, see 14.00F7), hepatitis, HIV-associated dementia, immune reconstitution inflammatory syndrome (IRIS), infections (bacterial,

31

fungal, parasitic, or viral), lipodystrophy (lipoatrophy or lipohypertrophy), malnutrition, muscle weakness, myositis, neurocognitive or other mental limitations not meeting the criteria in 12.00, oral hairy leukoplakia, osteoporosis, pancreatitis, peripheral neuropathy) resulting in significant, documented symptoms or signs (for example, but not limited to, fever, headaches, insomnia, involuntary weight loss, malaise, nausea, night sweats, pain, severe fatigue, or vomiting) and one of the following at the marked level:

1. Limitation of activities of daily living;

2. Limitation in maintaining social functioning; or

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 14.11.

The ALJ acknowledged that Denise had severe impairments, including HIV, but—based on the medical record—determined that she did not meet the requirements of Listing 14.11. (R. 30, 32-35). As the listing requirements describe severe impairments preventing a person from engaging in any gainful activity, there is no inconsistency in the ALJ finding that Denise's HIV was a severe impairment at step two, but concluding that it did not meet the requirements of Listing 14.11. See Zebley, 493 U.S. at 532; Johnson v. Berryhill, 2019 U.S. Dist. Lexis 88733, at *19 (S.D. Ga. May 28, 2019) ("[T]here is no inconsistency between the ALJ finding a severe impairment as step two, but then concluding Plaintiff's severe impairment of HIV was not severe

enough to satisfy a Listing at step three.").

The ALJ's decision is also supported by substantial evidence. Denise's Motion for Summary Judgment alleges that "the laboratory data indicates a status that could have potentially cost [Denise's] life," and that she was required to change medications when they stopped working due to her disease "[l]ikely advancing." Pl.'s Br. (ECF No. 16, at 2); (R. 913-15). However, as noted by the ALJ, Denise's medical record shows that in April 2009, soon after the expiration of her date last insured, she was clinically stable even though not on antiretroviral therapy. (R. 34, 930); see also Martinez v. Comm'r of Soc. Sec., No. 18-CV-00580 (SN), 2019 U.S. Dist. LEXIS 49504, at *6 (S.D.N.Y. Mar. 25, 2019) (finding that a claimant whose HIV was "well-controlled" was not severe enough to meeting Listing 14.11). Further, when Denise began taking HIV medication again in 2010, she experienced "[c]ontrolled viral replication." (R. 931-32). And symptoms that "can be reasonably controlled by medication or treatment" are not considered disabling. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965); 20 C.F.R. § 404.1530); see also Capaccio v. Comm'r of Soc. Sec., No. 16-CV-843 HBS, 2018 U.S. Dist. LEXIS 139390, at *15 (W.D.N.Y. Aug. 16, 2018) (finding that the claimant did not meet the requirement for Listing 14.11 where

33

she "was complaint with her medication and felt good while taking it"). Around the relevant period, Denise also denied HIV-related symptoms including fevers, chills, and sweats and reported "doing" and "feel[ing] well." (R. 928-31). Additionally, changes in medication and the progression of HIV are not factors considered by Listing 14.11. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 14.11. Rather, Listing 14.11 considers factors such as a claimant's CD4 count or infections. See id. But, as the ALJ determined from the record, Denise's CD4 count was not low enough to meet the requirements of Listing 14.11. (R. 32). Lastly, the record does indicate that Denise experienced some infections in 2009 in the form of bacterial vaginosis, but Dr. Kluger noted in June 2010 that he did not think Denise's recurrent bacterial vaginosis was related to her HIV. (R. 932).

In determining whether a party meets the requirements of a listing, ALJs must consider not only whether the requirements of the listing are met, but if there is an impairment that when combined meets the requirements of a listing. 20 C.F.R. §§ 404.1520, 416.920. Specifically, SSR 02-1p "remind[s] adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1P, 2002 WL 34686281, at *1 (Sept. 12, 2002). In compliance with this

34

ruling, the ALJ considered the effects of Denise's obesity on her other impairments, including her HIV, and "conclude[d] that obesity did not increase the severity of any coexisting or related impairments to the extent that the combination of the impairments meet[] the requirements of any listing." (R. 32). Thus, there is no indication that in 2009 Denise was per se disabled under Listing 14.11 for HIV infection, and the ALJ's decision is supported by substantial evidence.

## V.   RECOMMENDATION

For the foregoing reasons, the Court recommends that the Court DENY Denise's Motion for Summary Judgment (ECF No. 16), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 17) and AFFIRM the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served

with a copy thereof.

    2.   A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

    The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 26, 2020

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Denise L. Noel
417 Summit Court
Hampton, VA 23666

Sean Douglas Jansen
U.S. Attorney's Office (Norfolk)
101 W. Main Street, Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____

Deputy Clerk

_____, 2020

37